**Christopher R. Kelly**
**Gregory R. Bockin***
**Kingdon Kase***
**Cecilia B. Connor**
**Matthew Homberger**
**UNITED STATES SECURITIES AND EXCHANGE COMMISSION**
**Philadelphia Regional Office**
**1617 JFK Boulevard, Suite 520**
**Philadelphia, PA 19103**
**KellyCR@sec.gov**
***Not admitted in the U.S. District Court for the Southern District of New York**

## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| **UNITED STATES SECURITIES AND EXCHANGE COMMISSION,** | 22-CV-8142 |
| **Plaintiff,** | |
| **v.** | **COMPLAINT** |
| **MORNINGVIEW FINANCIAL, LLC and MILES M. RICCIO,** | **JURY TRIAL DEMANDED** |
| **Defendants, and** | |
| **JOSEPH M. RICCIO, JR.** | |
| **Relief Defendant.** | |

Plaintiff United States Securities and Exchange Commission (the "SEC") files this

Complaint against defendants Morningview Financial, LLC ("Morningview Financial") and

Miles M. Riccio ("Miles Riccio" and, together with Morningview Financial, "Defendants"), and

relief defendant Joseph M. Riccio, Jr. ("Joseph Riccio" or "Relief Defendant") and alleges as

follows:

## SUMMARY

1.      From approximately July 2017 through at least December 2021 (the "Relevant Period"), Morningview Financial and Miles Riccio, its managing member and 64%-owner, acted as securities dealers notwithstanding the fact that they were not registered as dealers with the SEC, nor was Miles Riccio associated with an SEC-registered dealer.

2.      Morningview Financial's business model—which was carried out under Miles Riccio's direction and control—involved purchasing convertible notes or warrants from penny stock issuers, converting the notes or warrants into stock at a large discount from the prevailing market price, and then selling the newly issued shares into the public markets for a profit.

3.      During the Relevant Period, Defendants funded 35 issuers in exchange for at least 68 convertible notes and 4 warrant agreements, and converted the notes and the warrants to obtain more than 3.2 billion shares of newly issued shares of common stock.  Defendants then sold over 90% of these new shares of common stock, which had never traded publicly until Defendants introduced them into the public markets.

4.      Defendants' convertible notes and warrants business was lucrative.  Specifically, Defendants generated over $14.8 million in profits from their post-conversion sale of the newly-issued shares.  Defendants' conduct was for the exclusive benefit of Morningview Financial, and the vast majority of the proceeds from these activities ultimately was transferred to Miles Riccio and Joseph Riccio, as members and owners of the company.

5.      In practice, Defendants began to sell post-conversion shares soon after each conversion, and derived profits from the sale of such shares principally from the discounted acquisition price, as opposed to appreciation in the market price of the issuer's common stock.

2

Upon information and belief, however, Morningview Financial continues to hold some unconverted notes and shares derived from converted notes.

6.     Miles Riccio at all times controlled and had final authority over Morningview Financial's business decisions.  His actions committed Morningview Financial to the initial investments, and to the later acquisition and sale of discounted shares.  Miles Riccio signed all of the agreements pursuant to which Morningview Financial acquired the convertible notes and warrants.  He signed the notices that Morningview Financial used to convert the notes or warrants into newly issued, free-trading shares.  He controlled Morningview Financial's bank accounts and authorized the funding wires.  He also controlled Morningview Financial's brokerage accounts and executed the paperwork needed to deposit the converted shares into Morningview Financial's brokerage accounts.

7.     By failing to register as securities dealers, and by Miles Riccio's failure to associate with a registered securities dealer, Morningview Financial and Miles Riccio avoided the regulatory obligations that govern dealer conduct. Those obligations include submitting to regulatory inspections and oversight, following financial responsibility rules targeted at brokers and dealers, and maintaining books and records in accordance with applicable regulatory requirements.

8.     Relief Defendant Joseph Riccio also was unjustly enriched through his receipt of a portion of the over $14.8 million in illegal profits generated as a result of Defendants' unlawful conduct.  Specifically, Joseph Riccio received distributions from Morningview Financial derived from Defendants' securities law violations to which he had no legitimate claim.

## **VIOLATIONS**

9.      By virtue of the conduct alleged in this Complaint, Morningview Financial and Miles Riccio have violated Section 15(a)(1) of the Securities Exchange Act of 1934 (the "Exchange Act") [15 U.S.C. § 78o(a)].  Miles Riccio also is liable as a control person under Section 20(a) of the Exchange Act [15 U.S.C. § 78t(a)] for Morningview Financial's violations of Exchange Act Section 15(a)(1).

10.     Unless Morningview Financial and Miles Riccio are restrained and enjoined, they will continue to engage in the acts, practices, transactions, and courses of business set forth in this Complaint, or in acts, practices, transactions, and courses of business of similar type and object.  The SEC seeks injunctive relief, disgorgement, civil penalties, and other appropriate and necessary equitable relief, including penny stock bars, and, as to the Relief Defendant, an order directing him to return the proceeds resulting from Defendants' violations that were distributed to him and to which he has no legitimate claim.

## **JURISDICTION AND VENUE**

11.     The SEC brings this action pursuant to Section 21(d) of the Exchange Act [15 U.S.C. § 78u(d)] to enjoin such acts, practices, and courses of business, and to obtain disgorgement, prejudgment interest, civil money penalties, and such other and further relief as the Court may deem just and appropriate.

12.     This Court has jurisdiction over this action pursuant to Sections 21(d) and 27 of the Exchange Act [15 U.S.C. §§ 78u(d) and 78aa].

13.     Venue in this District is proper pursuant to Section 27 of the Exchange Act [15 U.S.C. § 78aa].  Among other things, certain of the acts, practices, and courses of business

constituting the violations of the federal securities laws alleged herein occurred within the Southern District of New York.

## DEFENDANTS

14.     **Morningview Financial LLC** is a Wyoming limited liability company ("LLC") formed in July 2017, with its current principal place of business in Burbank, California.  During a portion of the Relevant Period, Morningview Financial operated out of an office in New York, New York.  Miles Riccio and Joseph Riccio are Morningview Financial's founding members. Morningview Financial is principally engaged in the convertible notes business.  Morningview Financial relies on its own capital for its purchases and sales of securities, does not accept money from third parties, and has had one employee working on its behalf (the "Sole Employee"). Morningview Financial has never registered with the SEC, either as a securities dealer, or in any other capacity.

15.     **Miles Riccio**, age 30, currently resides in Los Angeles, California, although during a portion of the Relevant Period he resided in New York, New York.  He serves as Morningview Financial's managing member, owns 64% of the company, and exercises ultimate decision-making authority over its business.  Miles Riccio received periodic distributions from Morningview Financial during the Relevant Period.  He has never been registered with the SEC in any capacity.

## RELIEF DEFENDANT

16.     **Joseph Riccio**, age 70, resides in Paramus, New Jersey, and is Miles Riccio's uncle.  Joseph Riccio is a member of Morningview Financial, owns 36% of the company, and contributed the majority of its starting capital.  Joseph Riccio received periodic distributions from the company during the Relevant Period.  He also sells insurance products as an

independent contractor of a registered broker-dealer and investment adviser based in Newark, New Jersey ("Broker-Dealer and Investment Adviser").  In that role, Joseph Riccio is associated with Broker-Dealer and Investment Adviser as a registered representative/investment adviser representative and holds Securities Industry Essentials and Series 6, 63, and 65 licenses.

## FACTS

17.     During the Relevant Period, Morningview Financial and Miles Riccio operated a business in New York, New York, through which they predominantly purchased convertible notes or warrants directly from penny stock issuers, waited for the applicable holding period for the notes to elapse (6 to 12 months) using the Rule 144 safe harbor under Section 4(a)(1) of the Securities Act of 1933, converted the notes or warrants at an agreed upon substantial discount to the prevailing market price, and then resold the newly issued shares into the public markets.  The Rule 144 safe harbor provides conditions under which the public resale of securities acquired in unregistered, private sales from the issuing company is allowed.

### Morningview Financial was Controlled by Miles Riccio

18.     Miles Riccio managed all operations of Morningview Financial during the Relevant Period.

19.     Miles Riccio had final decision-making authority for all convertible note and warrant financings made by Morningview Financial, and signed all of the stock purchase agreements and conversion notices.

20.     Miles Riccio determined when Morningview Financial should convert (or partially convert) a note or warrant, and when to sell the post-conversion shares.  He was the only person with authority to bind Morningview Financial on its convertible notes and warrants.

21.     Miles Riccio was also the only individual with access to Morningview Financial's brokerage accounts.

22.     Morningview Financial employed one other individual during the Relevant Period, the Sole Employee, but Miles Riccio had primary responsibility for selecting issuers for funding, conducting diligence on convertible note opportunities, and maintaining relationships with issuers that Morningview Financial had previously financed in an effort to service their ongoing financing needs.

**Defendants Financed Predominantly Penny Stock**
**Issuers through Convertible Notes and Warrants**

23.     During the Relevant Period, Morningview Financial was a well-known lender to public companies seeking financing through convertible note transactions, almost all of which were penny stock issuers trading on the over-the-counter ("OTC") markets.

24.     Nearly all of the shares that Defendants sold in their business were acquired directly from issuers through note conversions and warrants, and not from purchases made in the secondary market.

25.     Defendants' public sale of unrestricted, newly issued shares significantly increased the amount of shares trading publicly and the issuers' unrestricted share totals.

26.     Between approximately August 2017 and December 2021, Morningview Financial and Miles Riccio executed stock purchase agreements with 35 issuers, causing it to purchase at least 68 convertible promissory notes and 4 warrants directly from the issuers.

27.     The notes typically had: (a) a one-year maturity; (b) principal amounts between $5,000 and $262,500; (c) interest rates between 4% and 12%; and (d) steep prepayment penalties.

28.     The notes' conversion terms also significantly favored Morningview Financial, allowing the company, in its sole discretion, to convert the debt into common stock at a significant discount to the prevailing market price after the Rule 144 holding period lapsed.

29.     The discounts typically ranged from 30% to 50% off the lowest closing or trading price of the stock during the 10 to 40 days before the conversion.

30.     Most of the notes also contained original issue discounts, which entitled Morningview Financial to convert the note to stock or be repaid with interest based on the face amount of the note rather than the discounted price Morningview Financial paid for it.

31.     Many of the notes included additional discounts, including in the event that the issuer defaulted on the note.

**Defendants Targeted Penny Stock Issuers with Strong Trading Volume**

32.     Miles Riccio and the Sole Employee attended investor conferences to develop and maintain industry contacts.

33.     Defendants' contacts frequently referred convertible note deals to Morningview Financial, although both Miles Riccio and the Sole Employee also cold-called and cold-emailed issuers regarding possible investment by Morningview Financial.

34.     In determining which issuers to cold-call regarding investment, the most important criteria to Miles Riccio was the trading volume of the issuer.

35.     The primary responsibility of the Sole Employee was to identify issuers with strong trading volume on the OTC markets and to solicit these issuers for investment.

36.     In one two-week period in March 2019, the Sole Employee made approximately 100 calls to OTC issuers identified as having strong trading volume.

37.    Nearly half of the issuers that Morningview Financial financed through convertible notes sought additional financing from Morningview Financial, with some selling Morningview Financial six or more convertible notes during the Relevant Period.

**Defendants Were in the Business of Converting Their Notes and
Warrants to Equity, and Selling Those Newly Issued Shares into the Market**

38.    It was important to Defendants that the terms of the convertible notes they entered into included a reserve of shares to ensure that there would be enough shares available to be converted pursuant to the note.

39.    The convertible notes each expressly included a provision regarding the number of shares that the issuer was required to have authorized and reserved.

40.    Defendants often began the conversion process soon after the Rule 144 holding period for the notes expired by submitting a conversion notice to the issuer, its transfer agents, and Morningview Financial's broker.

41.    Defendants typically paid a $500 processing rush fee to ensure that the shares were deposited quickly into its trading accounts.

42.    In practice, approximately 66% of the notes were fully or partially repaid through share conversions, approximately 24% were fully repaid through cash payments, and approximately 10% were never repaid or converted for various reasons, including that the issuer's shares became ineligible for immediate resale under Rule 144, the issuer had insufficient shares to honor the conversion notice, or the issuer refused to honor the conversion or repay the note.

43.    Defendants generally converted the notes in several increments.

44.    Once the shares were deposited into Morningview Financial's brokerage accounts, Defendants typically began selling the shares immediately, at Miles Riccio's direction.

45.     Defendants sought to sell the shares as rapidly as the market would bear, usually within a few days or weeks of conversion.

46.     With respect to Defendants' 213 conversion transactions, the average time between the conversion date and first corresponding sale of converted shares was 8.34 calendar days.  For 79% of these conversions, Defendants sold some of the converted shares within 0 to 7 days of the conversion date.

47.     Defendants sold more than 3 billion newly issued shares of common stock into the public markets during the Relevant Period, and earned approximately $14.8 million in profits from the sale of such shares.

48.     Defendants' profits from the sale of the newly issued shares are attributable primarily to the discount applied to the convertible notes that Morningview Financial received on the converted stock, rather than from the appreciation in share price.

**Through Their Conduct, Defendants Diluted the Equity of Existing
Shareholders and Often Depressed the Price of Issuers' Stock**

49.     During the Relevant Period, Defendants sold converted shares, on a per-ticker basis, on 1,044 separate days.

50.     Defendants' repeated conversion of notes and warrants and sale of newly issued shares not only increased the number of issued and outstanding shares, but also increased each issuer's public float – namely, the shares in the hands of public investors.

51.     As a result, Defendants' sales diluted the equity positions of existing shareholders and often depressed the price of issuers' stock.

52.     Defendants' sales of post-conversion shares frequently were a material percentage of the volume of total trades on the days it traded.

53.     For instance, Defendants' sales volumes as a percentage of the overall market volume on the days it traded the following eight penny stocks during the Relevant Period are as follows:

| Issuer | Symbol | # of Trade Dates | # of Trade Dates where Morningview Financial was >20% of volume | Highest Daily % | Lowest Daily % | Total Shares Sold by Morningview Financial | Total Market Volume on Morningview Financial Trade Dates |
|---|---|---|---|---|---|---|---|
| Blue Sphere Corp. | BLSP | 64 | 19 | 100.0% | 0.3% | 502,468,628 | 14,159,203,556 |
| Two Rivers Water & Farming Company | TURV | 64 | 44 | 53.9% | 8.2% | 9,979,855 | 44,219,240 |
| HealthLynked Corp. | HLYK | 62 | 42 | 46.5% | 1.5% | 6,124,095 | 24,033,566 |
| Digerati Technologies Inc. | DTGI | 57 | 23 | 100.0% | 4.3% | 2,837,799 | 14,094,689 |
| IronClad Encryption Corp. | IRNC | 49 | 24 | 54.8% | 3.1% | 362,786,896 | 2,199,036,720 |
| Artificial Intelligence Technology Solutions Inc. | AITX | 46 | 17 | 46.3% | 1.0% | 27,295,891 | 463,904,368 |
| Exactus Inc. | EXDI | 39 | 35 | 100.0% | 12.7% | 2,865,152 | 8,651,169 |
| Galaxy Next Generation, Inc. | GAXY | 38 | 6 | 40.7% | 0.2% | 67,254,083 | 671,289,340 |

54.     The following are just three specific examples as to how Defendants profited through their activities as unregistered dealers.

**Defendants Received Net Proceeds of Almost $500,000 by
Converting and Selling Newly Issued Shares of Drone USA, Inc.**

55.     Defendants funded a note with Drone USA, Inc. ("DRUS") with an issue date of December 13, 2017, a net principal amount of $82,500, and an original issue discount of $7,500.

56.     Morningview Financial was entitled to convert the debt at a 35% discount from the lowest closing bid price during the 20 days before conversion, unless the trading price was

equal to or lower than $.05, in which event Morningview Financial could convert the debt at a 45% discount.

57.     The convertible promissory note included a prepayment fee of 135% of the amount prepaid for the first 180 days after the issue date, after which prepayment was not allowed.

58.     The note also included a provision that the issuer was required to have authorized and reserved eight times the number of shares actually issuable upon full conversion of the note.

59.     Defendants first converted $10,000 of principal into 2,692,308 shares on June 13, 2018, and converted the remaining debt into 53,534,698 shares on eight days over the next six weeks.

60.     Because the price of DRUS was less than $.05, Morningview Financial was able to convert the debt at a 45% discount.

61.     Between June 14, 2018, and August 29, 2018, Defendants sold all converted shares, which resulted in net proceeds to Defendants of almost $500,000.

**Defendants Received Net Proceeds of Almost $265,000 by
Converting and Selling Newly Issued Shares of HealthLynked Corp.**

62.     Defendants funded a note with HealthLynked Corp. ("HLYK") with an issue date of June 3, 2019, and a net principal amount of $154,000.

63.     Morningview Financial was entitled to convert the debt at a discount rate of 39% from the lowest closing bid price during the 15 days before conversion.

64.     The convertible promissory note included a prepayment fee of 125% of the amount prepaid for the first 180 days after the issue date, after which prepayment was not allowed.

65.     The note also included a provision that the issuer was required to have authorized and reserved five times the number of shares actually issuable upon full conversion of the note.

66.     Defendants first converted $24,000 of principal into 306,595 shares on December 4, 2019, and converted the remaining $130,000 of principal into 2,234,784 shares on four days over the following month.

67.     Between December 6, 2019, and January 30, 2020, Defendants sold all shares converted pursuant to this note, which resulted in net proceeds to Defendants of approximately $127,906.

68.     Defendants entered into a total of 6 notes with HLYK over the Relevant Period.

69.     Defendants converted three of the notes, and HLYK repaid Morningview Financial in connection with the other three notes.

70.     Defendants received almost $265,000 in net proceeds from the sale of all converted shares in HLYK.

**Defendants Received Net Proceeds of Approximately $135,000 by Converting and Selling Newly Issued Shares of Kiwa Bio-Tech Products Group Corp.**

71.     Defendants funded a note with Kiwa Bio-Tech Products Group Corp. ("KWBT") with an issue date of October 11, 2019, a net principal amount of $135,000, and an original issue discount of $6,750.

72.     Morningview Financial was entitled to convert the debt at a 40% discount rate from the lowest closing bid price during the 20 days before conversion, as long as the discounted price was less than $0.75.  On the day the note was funded, KWBT closed at $.15.

73.     The convertible promissory note included steep, tiered prepayment fees of 115% to 130% of the amount prepaid for the first 180 days after the issue date, after which prepayment was not allowed.

74.     The note also included a provision that the issuer was required to have authorized and reserved five times the number of shares actually issuable upon full conversion of the note.

75.     Defendants first converted $35,000 of principal into 5,282,739 shares on June 8, 2020, and over the next two weeks converted the remaining $100,000 into a total of 23,115,349 shares.

76.     Defendants sold all 28,398,088 shares from the conversions between June 9 and June 24, 2020, at a price per share ranging from between $.008 and $.01, which resulted in net proceeds to Defendants of approximately $135,000.

## CLAIMS FOR RELIEF

## FIRST CLAIM

**Violations of Section 15(a)(1) of the Exchange Act [15 U.S.C. § 78o(a)(1)]
(Against Defendants Morningview Financial and Miles Riccio)**

77.     The SEC re-alleges and incorporates by reference the allegations set forth in Paragraphs 1 through 76 above.

78.     By engaging in the conduct described above, Defendants made use of the mails or other means or instrumentalities of interstate commerce to effect transactions in, to induce, or to attempt to induce, the purchase or sale of securities for their own account as part of a regular business while not registered with the SEC as dealers, and when Defendant Miles Riccio was not associated with an entity registered with the SEC as a dealer.

79.     By reason of the foregoing, Defendants violated, and unless enjoined will likely again violate, Section 15(a)(1) of the Exchange Act [15 U.S.C. § 78o(a)(1)].

## SECOND CLAIM

**Control Person Liability Pursuant to Section 20(a) for
Violations of Exchange Act Section 15(a)(1) [15 U.S.C. § 78t(a)]
(Against Defendant Miles Riccio Only)**

80.     The SEC re-alleges and incorporates by reference the allegations in Paragraphs 1

through 79 above.

81.     As set forth in the First Claim, Morningview Financial violated Section 15(a)(1)

of the Exchange Act [15 U.S.C. § 78o(a)].

82.     At all relevant times, Defendant Miles Riccio controlled Morningview Financial

and was a culpable participant in its violations of Section 15(a)(1) of the Exchange Act [15

U.S.C. § 78o(a)].

83.     By reason of the foregoing, Defendant Miles Riccio is liable as a control person

pursuant to Section 20(a) of the Exchange Act [15 U.S.C. § 78t(a)] for Morningview Financial's

violations of Exchange Act Section 15(a)(1) [15 U.S.C. § 78o(a)].

## THIRD CLAIM

**Unjust Enrichment
(Against Relief Defendant Joseph Riccio)**

84.     The SEC re-alleges and incorporates by reference the allegations set forth in

Paragraphs 1 through 83 above.

85.     Relief Defendant Joseph Riccio received proceeds derived from Defendants'

securities law violations as alleged above, and has no legitimate claim to such funds.

86.     By virtue of the foregoing, Relief Defendant Joseph Riccio was unjustly enriched

and, under the circumstances, it is not just, equitable, or consionable for him to retain the above-

described funds.

## **PRAYER FOR RELIEF**

WHEREFORE, the SEC respectfully requests that the Court enter a final judgment:

**I.**

Permanently restraining and enjoining Defendants Morningview Financial and Miles Riccio, as well as their members, managers, agents, servants, employees, attorneys-in-fact and persons in active concert or participating with them, from violations of Section 15(a)(1) of the Exchange Act [15 U.S.C. § 78o(a)(1)];

**II.**

Ordering Morningview Financial and Miles Riccio, jointly and severally, to disgorge, with prejudgment interest, all ill-gotten gains received, directly or indirectly, from the activities set forth in this Complaint, pursuant to 21(d)(5) and 21(d)(7) of the Exchange Act [15 U.S.C. §§ 78u(d)(5) and 78u(d)(7)];

**III.**

Ordering Relief Defendant, Joseph Riccio, to disgorge all ill-gotten gains and/or unjust enrichment received, directly or indirectly, with pre-judgment interest thereon, as a result of the violations alleged in this Complaint, pursuant to 21(d)(5) and 21(d)(7) of the Exchange Act [15 U.S.C. §§ 78u(d)(5) and 78u(d)(7)];

**IV.**

Ordering Morningview Financial and Miles Riccio to pay civil penalties pursuant to Section 21(d)(3) of the Exchange Act [15 U.S.C. § 78u(d)(3)];

**V.**

Permanently barring Morningview Financial and Miles Riccio from participating in any

offering of any penny stock, including by engaging in activities with a broker, dealer, or issuer

for purposes of issuing, trading, or inducing or attempting to induce the purchase or sale of any

penny stock, pursuant to Exchange Act Section 21(d)(6) [15 U.S.C. § 78u(d)(6)]; and

**VI.**

Granting such other and further relief that this Court deems just, equitable, or necessary

in connection with the enforcement of the federal securities laws and for the protection of

investors, including, but not limited to, ordering the surrender and cancellation of any securities

(including convertible notes, warrants, and shares) obtained by Morningview Financial in

connection with its convertible notes business that are still held by Morningview Financial.

Respectfully submitted,

Date:   September 23, 2022

Christopher R. Kelly
Gregory R. Bockin*
Kingdon Kase*
Cecilia B. Connor
Matthew Homberger
United States Securities and Exchange Commission
Philadelphia Regional Office
1617 JFK Boulevard, Suite 520
Philadelphia, PA  19103
(215) 597-3741 (Kelly)
KellyCR@sec.gov

*Not admitted in the S.D.N.Y.