```
USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #:_____
DATE FILED: 11/7/23
```

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

U.S. SECURITIES & EXCHANGE COMMISSION,

               Plaintiff,

      - against -

MORNINGVIEW FINANCIAL LLC and
MILES M. RICCIO,

               Defendants, and

JOSEPH M. RICCIO, JR.,

               Relief Defendant.

**22 Civ. 8142 (VM)**

**DECISION AND ORDER**

**VICTOR MARRERO, United States District Judge.**

When it passed the Securities Exchange Act of 1934 (the "Exchange Act" or the "Act") nearly 90 years ago, Congress defined "dealer" as "any person engaged in the business of buying and selling securities for his own account, through a broker or otherwise." Ch. 404, tit. I, § 3(a)(5), 48 Stat. 883 (1934) (codified as amended at 15 U.S.C. § 78c(a)(5)(A)). The Court is now asked a question about the Act whose answer is not clearly settled under the law of this Circuit: whether the Act's definition of "dealer" encompasses a business that purchases convertible notes from penny stock issuers, converts the notes into stock at large discounts from prevailing market prices, and sells the converted stock into the public markets for profit.

1

The question arises in the context of a motion filed by defendants Morningview Financial, LLC ("Morningview Financial" or "Morningview") and Miles M. Riccio to dismiss this U.S. Securities and Exchange Commission ("SEC" or "Commission") enforcement action. (See Dkt. No. 1 [hereinafter "complaint" or "Compl."]; Notice of Motion to Dismiss, Dkt. No. 21.) Because the Court holds that the Act's definition of "dealer" does encompass the alleged behavior and related transactions of the defendants, and for additional reasons stated below, the Court **DENIES** the motion to dismiss.

## I.   BACKGROUND

A.   THE SEC'S ALLEGATIONS[1]

Miles M. Riccio ("Riccio" and, together with Morningview, "Defendants") and his uncle Joseph M. Riccio Jr. ("Riccio Jr.") founded Morningview Financial in July 2017 under Wyoming law. As of September 23, 2022, Morningview's principal place of business was Burbank, California, although it operated out of an office in New York City for a portion of the period between July 2017 and

---

[1] Except as otherwise noted, the facts stated here are alleged in the complaint. (See Dkt. No. 1.) For the purposes of addressing Defendants' motion to dismiss, the Court assumes all facts alleged in the complaint are true and draws all reasonable inferences in the plaintiff's favor. See Lateral Recovery, LLC v. Cap. Merch. Servs., LLC, 632 F. Supp. 3d 402, 435 (S.D.N.Y. 2022).

at least December 2021 (the "relevant period"). It has had one employee (the "Morningview employee") working on its behalf. Morningview was principally engaged in the convertible notes business,[2] and the company never registered with the SEC in any capacity.

Riccio was Morningview's managing member and owned 64 percent of the company. He exercised ultimate decision-making authority over Morningview's business and managed its operations. Riccio received periodic distributions from the company during the relevant period. He never registered with the SEC in any capacity.

Riccio Jr. was also a member of Morningview Financial. He owned the remaining 36 percent of the company. Riccio Jr. contributed most of the company's starting capital and, like Riccio, received periodic distributions during the relevant period.

Morningview was a well-known lender to public companies seeking financing through convertible note transactions. Almost all of those companies were penny stock issuers trading on over-the-counter markets.[3] To

---

[2] Convertible notes are corporate bonds that can be converted by the holder into stock of the issuing company. See Nick Lioudis, An Introduction to Convertible Bonds, Investopedia (Dec. 16, 2021), https://www.investopedia.com/investing/introduction-convertible-bonds/ [https://perma.cc/76X3-HT4N].

[3] Over-the-counter securities are traded without being listed on an exchange. See Chris B. Murphy, Over-the-Counter (OTC): Trading and

identify those companies, Riccio and the Morningview employee attended investor conferences to develop industry contacts, and those contacts referred convertible note deals to Morningview. Riccio and the Morningview employee also cold-called and cold-emailed issuers regarding potential investment. Nearly half of the issuers that Morningview financed through convertible notes sought additional financing from Morningview, with some selling Morningview six or more convertible notes during the relevant period.

For Riccio, the most important attribute in determining which issuers to cold-call regarding investment was the issuer's trading volume. The primary responsibility of the Morningview employee was to identify issuers with strong trading volume on over-the-counter markets and to solicit such issuers for investment. In one two-week period in March 2019, the Morningview employee made approximately 100 calls to over-the-counter issuers identified as having strong trading volume. Riccio, however, had primary

---

Security Types Defined, Investopedia (Apr. 24, 2023), https://www.investopedia.com/terms/o/otc.asp [https://perma.cc/CAV7-CYWC]. Penny stocks are typically equities in small companies that trade for less than $5 per share. See Chris B. Murphy, What Are Penny Stocks?, Investopedia, https://www.investopedia.com/terms/p/pennystock.asp [https://perma.cc/5RKQ-CJ5C]. Those companies are often "microcap" companies with market capitalizations of less than $300 million. See Microcap Stock: A Guide for Investors, U.S. Sec. & Exch. Comm'n (Sept. 18, 2013), https://www.sec.gov/reportspubs/investor-publications/investorpubsmicrocapstock [https://perma.cc/W5T4-Q6AR].

responsibility for selecting issuers for funding, conducting diligence on convertible note opportunities, and maintaining relationships with issuers that Morningview had previously financed.

During the relevant period, Morningview and Riccio executed stock purchase agreements with 35 issuers, purchasing at least 68 convertible promissory notes and four warrants[4] directly from the issuers. The notes typically had a one-year maturity period, a principal amount between $5,000 and $262,500, an interest rate between 4 and 12 percent, and steep prepayment penalties. The notes' conversion terms significantly favored Morningview, allowing the company in its sole discretion to convert the debt into common stock at a significant discount from the prevailing market price after the lapse of the holding period required under 17 C.F.R. § 230.144, also known as "Rule 144."[5] The discounts normally ranged

---

[4] A warrant is "[a]n instrument granting the holder a long-term . . . option to buy shares at a fixed price." Warrant, Black's Law Dictionary (11th ed. 2019). Warrants are "commonly attached to preferred stocks or bonds." Id.

[5] Rule 144, promulgated under Section 4(a)(1) of the Securities Act of 1933, 15 U.S.C. § 77d(a)(1), sets forth safe-harbor conditions under which a holder of certain securities can sell the securities in a public marketplace without complying with registration requirements for transactions in securities pursuant to the Securities Act of 1933. See Rule 144: Selling Restricted and Control Securities, U.S. Sec. & Exch. Comm'n, https://www.sec.gov/reportspubs/investor-publications/investorpubsrule144 [https://perma.cc/QSU7-SJKS] (last visited Oct. 19, 2023). One of the conditions is that the securities be

from 30 to 50 percent off the lowest closing or trading price of the stock during the 10 to 40 days before the conversion.

It was important to Defendants that the terms of the convertible notes provided for a reserve of shares to ensure that there would be enough shares available to be converted pursuant to the notes. Each note expressly included a provision regarding the number of shares the issuer was required to have authorized and reserved. Approximately 66 percent of the notes were fully or partially repaid through share conversions.

Defendants usually converted the notes in several increments. They often began the conversion process soon after the expiration of the Rule 144 holding period by submitting a conversion notice to the issuer, its transfer agents, and Morningview's broker. Defendants paid processing rush fees to ensure that shares were deposited quickly into trading accounts.

Riccio had final decision-making authority for all convertible note and warrant financings made by Morningview, and he signed all relevant stock purchase agreements and conversion notices. He determined when

---

held for six months or one year, depending on the circumstances. See id.; see also 17 C.F.R. § 230.144(d)(1)(i)-(ii).

Morningview should fully or partially convert a note or warrant and when to sell the post-conversion shares. Riccio was the only person with authority to bind Morningview with respect to its convertible notes and warrants, and he was the only person with access to Morningview's brokerage accounts.

Once the shares were deposited into Morningview's brokerage accounts, Defendants typically sought to sell shares as quickly as the market would bear, usually within a few days or weeks of conversion, at Riccio's direction. With respect to Defendants' 213 conversion transactions, the average time between the conversion date and the first corresponding sale of converted shares was between eight and nine calendar days. For 79 percent of those conversions, Defendants sold some of the converted shares within zero to seven days of the conversion date.

During the relevant period, Defendants sold more than 3 billion newly issued shares of common stock into the public markets and earned approximately $14.8 million in profit from the sales of such shares. Those profits were attributable primarily to the discount applied to the convertible notes that Morningview received on the converted stock rather than to an appreciation in share price. Nearly all the shares that Defendants sold in their

business were acquired directly from issuers through note conversions and warrants rather than from purchases made in the secondary market.

Defendants' public sales of unrestricted, newly issued shares significantly increased the amount of shares trading publicly, the issuers' unrestricted share totals, and the number of the issuers' shares in the hands of public investors. Defendants' sales accordingly diluted the equity positions of existing shareholders and often depressed the prices of issuers' stock. Defendants' sales of post-conversion shares frequently constituted a material percentage of the volume of total relevant trades on given days.

In one instance, Defendants funded a note with HealthLynked Corp. ("HLYK") whose issue date was June 3, 2019 and whose net principal amount was $154,000. Morningview was entitled to convert the debt at a discount rate of 39 percent from the lowest closing bid price during the fifteen days before conversion. The note included a prepayment fee of 125 percent of the amount prepaid for the first 180 days after the issue date, after which prepayment was not allowed. The note additionally included a provision that the issuer was required to have authorized and

reserved five times the number of shares issuable upon full
conversion of the note.

On December 4, 2019, Defendants converted $24,000 of
principal into 306,595 shares of HLYK. On four days over
the following month, they converted the remaining $130,000
of principal into more than 2.2 million shares of HLYK.
Between December 6, 2019 and January 30, 2020, Defendants
sold all the shares converted pursuant to the note, which
resulted in net proceeds to the Defendants of approximately
$127,906.

Defendants entered into a total of six notes with HLYK
over the relevant period. They converted three of the
notes; HLYK repaid Morningview with respect to the other
three. Defendants received almost $265,000 in net proceeds
from the sale of converted HLYK shares. On 42 trade dates,
Morningview Financial was responsible for more than 20
percent of the total HLYK trading volume, and Morningview
on at least one date was responsible for 46.5 percent of
HLYK's total trading volume.

B.   PROCEDURAL HISTORY

The SEC filed this action on September 23, 2022,
asserting three claims for relief. (See Compl. ¶¶ 77-86.)
First, the SEC accuses Morningview Financial and Riccio of

9

violating Section 15(a)(1) of the Exchange Act, 15 U.S.C.
§ 78o(a)(1), by engaging in the conduct described above
while not registered with the SEC as dealers or associated
with an entity registered with the SEC as a dealer. (See
id. ¶¶ 77-79.) Second, the SEC asserts that, pursuant to
Section 20(a) of the Exchange Act, 15 U.S.C. § 78t(a),
Riccio is liable as a "control person" for Morningview
Financial's violation of Section 15(a)(1) because he
controlled Morningview. (See id. ¶¶ 80-83.) Third, the SEC
brought an unjust enrichment claim against relief defendant
Riccio Jr., accusing him of receiving proceeds derived from
Defendants' securities law violations and to which he has
no legitimate claim. (See id. ¶¶ 84-86.)

Defendants moved to dismiss on April 21, 2023. (See
Dkt. Nos. 21-22.) The SEC filed its memorandum of law
opposing the motion on May 19, 2023. (See Pl.'s Mem. of Law
in Opp'n to Defs.' Mot. To Dismiss, Dkt. No. 23
[hereinafter "SEC Mem."].) Defendants filed reply papers on
June 2, 2023. (See Reply Mem. of Law in Supp. of Defs.'
Mot. To Dismiss, Dkt. No. 25 [hereinafter "Reply Mem."].)

On June 30, 2023, a letter request was filed on behalf
of proposed amici curiae Alternative Investment Management
Association, Ltd.; Trading and Markets Project, Inc.; and
the National Association of Private Fund Managers

(collectively "amici"). (See Dkt. No. 29.) The letter
sought leave to file a brief as amici curiae in support of
the motion to dismiss. (See id.) The SEC consented to the
filing of the amicus brief on the condition that it be
provided 30 days to file a brief in response. (See id. at
2.) The Court granted the requested leave, and the amicus
brief and the SEC's opposition papers were filed,
respectively, on July 6, 2023 and August 3, 2023. (See Dkt.
Nos. 32–34.)[6]

## II.  <u>LEGAL STANDARD</u>

Defendants moved to dismiss under Federal Rule of
Civil Procedure 12(b)(6) ("Rule 12(b)(6)"). (See Dkt. No.
21.) To survive such a motion, "a complaint must contain
sufficient factual matter, accepted as true, to 'state a
claim to relief that is plausible on its face.'" <u>Ashcroft
v. Iqbal</u>, 556 U.S. 662, 678 (2009) (quoting <u>Bell Atl. Corp.
v. Twombly</u>, 550 U.S. 544, 570 (2007)). This standard is
satisfied "when the plaintiff pleads factual content that
allows the court to draw the reasonable inference that the
defendant is liable for the misconduct alleged." <u>Id.</u> Put
differently, a complaint should not be dismissed when the

---

[6] Riccio Jr., the relief defendant, answered the complaint on November
21, 2022. (See Dkt. No. 15.) Only Miles M. Riccio and Morningview moved
to dismiss. (See Dkt. Nos. 21-22.)

plaintiff's allegations sufficiently "raise a right to relief above the speculative level." <u>Twombly</u>, 550 U.S. at 555. However, "the tenet that a court must accept as true all of the allegations contained in a complaint is inapplicable to legal conclusions." <u>Iqbal</u>, 556 U.S. at 678.

A Rule 12(b)(6) motion challenges only the legal feasibility of the complaint, and courts adjudicating such motions "take[] no account of the complaint's 'basis in evidence.'" <u>Nunes v. NBCUniversal Media, LLC</u>, 643 F. Supp. 3d 403, 411 (S.D.N.Y. 2022) (quoting <u>Goel v. Bunge, Ltd.</u>, 820 F.3d 554, 559 (2d Cir. 2016)). "Generally, courts do not look beyond facts stated on the face of the complaint, documents incorporated in the complaint, matters of which judicial notice may be taken and documents that are 'integral' to the complaint." <u>Id.</u> (quoting <u>Goel</u>, 820 F.3d at 559). At the same time, the Rule 12(b)(6) standard instructs the Court to construe the complaint "liberally." <u>In re Inclusive Access Course Materials Antitrust Litig.</u>, 544 F. Supp. 3d 420, 431 (S.D.N.Y. 2021) (quoting <u>Coal. for Competitive Elec. v. Zibelman</u>, 906 F.3d 41, 48-49 (2d Cir. 2018)).

### III. <u>DISCUSSION</u>

Defendants make two main arguments. First, they contend that the SEC has not adequately pleaded a claim pursuant to Section 15(a)(1) of the Exchange Act. (<u>See</u> Mem. of Law in Supp. of Defs.' Mot. to Dismiss, Dkt. No. 22 [hereinafter "Def. Mem."], at 6–20.) The corollary of this argument is that the SEC also has not sufficiently alleged control person liability against Riccio, as that claim depends on the Section 15(a)(1) claim. (<u>See</u> <u>id.</u> at 20.) Second, Defendants argue that even if the SEC has stated a Section 15(a)(1) claim, such a claim would be barred by principles of due process. (<u>See</u> <u>id.</u> at 21–23.)

A.   <u>SECTION 15(A)(1) OF THE EXCHANGE ACT</u>

Section 15(a)(1) of the Exchange Act provides that it "shall be unlawful" for any "dealer" to use the mail or the means of interstate commerce "to effect any transactions in, or to induce or attempt to induce the purchase or sale of," certain securities unless the dealer is registered with the SEC or qualifies for an exemption from the registration requirement. 15 U.S.C. § 78o(a)(1); <u>see</u> <u>id.</u> § 78o(b). Defendants and amici do not dispute that Defendants used the mail or the means of interstate commerce to effect transactions in securities. Nor do they

contend that Defendants were dealers exempt from the SEC registration requirement, or that the securities Defendants bought and sold are exempted under relevant provisions of the Act.

Instead, Defendants and amici argue that the SEC's complaint must be dismissed because Defendants were not "dealers" as that word is defined in the Exchange Act. (See generally Def. Mem.; Br. of Amici Curiae in Supp. of Defs.' Mot. to Dismiss, Dkt. No. 33 [hereinafter "Amicus Br."]). If Defendants did not act as dealers, then they cannot be held liable for failing to register as such in violation of Section 15(a)(1) of the Exchange Act. Such a conclusion would require dismissal of all three of the complaint's claims for relief, as the second and third claims depend on the SEC succeeding on the first claim — that is, they depend on Defendants being held liable for the Section 15(a)(1) violation. (See Compl. ¶¶ 77–86.)

The resolution of Defendants' motion to dismiss thus turns on the meaning of the word "dealer" as it is used in the Exchange Act. Despite the Act's long history, there appears to be no authority from the U.S. Supreme Court or Second Circuit settling the issue. Accord SEC v. River N. Equity LLC, 415 F. Supp. 3d 853, 858 (N.D. Ill. 2019) ("The 'dealer' definition has not been subject to extensive

14

judicial interpretation."). The Court's task is therefore one of statutory interpretation.

The Court "start[s], as always, with the language of the statute." United States v. Reich, 479 F.3d 179, 187 (2d Cir. 2007) (Sotomayor, J.) (quoting Williams v. Taylor, 529 U.S. 420, 431 (2000)). The Exchange Act defines "dealer" as "any person engaged in the business of buying and selling securities . . . for such person's own account through a broker or otherwise." 15 U.S.C. § 78c(a)(5)(A). But the Act makes an exception for a person who "buys or sells securities . . . for such person's own account, either individually or in a fiduciary capacity, *but not as part of a regular business*." 15 U.S.C. § 78c(a)(5)(B) (emphasis added). The parties refer to this exception as the "traders' exception." (See Def. Mem. at 8–9; SEC Mem. at 5.)

Defendants' motion to dismiss centers on their contention that, because they primarily served themselves rather than regular customers, they acted as traders, not dealers, and that they are therefore exempted from liability under the traders' exception. (See Def. Mem. at 6–20.) In response, the SEC argues that the traders' exception does not apply in light of the Commission's allegations that Defendants' business model provided

15

liquidity to penny stock issuers in exchange for convertible notes that Defendants then converted into stock to be sold for profit. (See SEC Mem. at 19-23.)

The key question for the Court is thus whether the SEC has adequately alleged that Defendants "engaged" in a "regular business" involving the "buying and selling [of] securities . . . for [their] own account." 15 U.S.C. § 78c(a)(5)(A)-(B).

In deciding this question, the Court must interpret the Exchange Act "in accord with the ordinary public meaning of its terms at the time of its enactment." Bostock v. Clayton County, 140 S. Ct. 1731, 1738 (2020). To discern the ordinary *public* meaning of a term, the Supreme Court has looked to dictionary definitions rather than asking what the term might have meant to a specialized audience. See id. at 1738-41; see also Kevin Tobia & John Mikhail, Essay, Two Types of Empirical Textualism, 86 Brooklyn L. Rev. 461, 461 (2021) (stating that there is "general agreement" that a statute's "ordinary meaning" is "derived from" or "equated" with "the general public's understanding of the text"). Since the relevant language defining "dealer" has not changed since it originally appeared in Section 3(a)(5) of the Exchange Act in June 1934, the ordinary public meaning of the phrase "engaged in the

[regular] business" around June 1934 controls whether the SEC has adequately alleged an Exchange Act violation in this case. Securities Exchange Act of 1934, ch. 404, tit. I [hereinafter the "Original Act"], § 3(a)(5), 48 Stat. 883 (1934) (codified as amended at 15 U.S.C. § 78c(a)(5)).

At the outset, the Court observes that giving effect to the literal meaning of the relevant Exchange Act language militates in favor of the SEC's position in this case. Indeed, the SEC has accused Defendants of (1) engaging in the business of regularly "buying . . . securities," 15 U.S.C. § 78c(a)(5), in the form of convertible notes or warrants from penny stock issuers for their own account (i.e., as principal rather than as agent for a third party) and (2) converting the notes or warrants into stock and "selling" the converted securities, id., into the public markets for a profit. (See, e.g., Compl. ¶ 2.) Defendants do not argue otherwise, and amici appear to concede this point. (See Amicus Br. at 8 (characterizing the SEC's reading of the statute as "hyper-literal").) Nor does any party argue that the literal meaning of the statutory language is different now than it was in 1934.

Instead, Defendants and amici argue that in 1934, the phrase "person engaged in the business of buying and selling securities," 15 U.S.C. § 78c(a)(5)(A), would have

been understood to refer to a person who buys securities
and sells them to *customers*; this definition therefore
would exclude someone investing his or her own money
according to his or her own investment decisions. (See Def.
Mem. at 8-10; Amicus Br. at 8-12.) Under this
interpretation of the statute, Defendants would not be
dealers because the SEC "has only alleged that Morningview
and Mr. Riccio invested for their own account[] and has not
alleged that Morningview or Mr. Riccio provided any
services to third[ ]parties." (Def. Mem. at 13.)[7]

The Court is not persuaded that it should adopt
Defendants' and amici's reading of the statute. As an
initial matter, the word "customer" appears throughout the
original Exchange Act, suggesting that when Congress wanted
to refer to a customer, it simply used the word "customer"
rather than speaking in code. See Caraco Pharm. Lab'ys,
Ltd. v. Novo Nordisk A/S, 566 U.S. 399, 416 (2012) ("So if

---

[7] Defendants and amici do not say exactly what they mean by "customers."
There is no dispute that Defendants bought and sold securities, and
anyone who buys something could be characterized as the seller's
customer. See Customer, Merriam-Webster.com, https://www.merriam-
webster.com/dictionary/customer [https://perma.cc/GHV6-PJDH] (last
visited Oct. 29, 2023) (defining "customer" as "one that purchases a
commodity or service"). But Defendants' and amici's position appears to
be that a customer is, more specifically, a "frequent or occasional
patron of a business establishment." Customer, Black's Law Dictionary
(11th ed. 2019) (defining "customer" as a "buyer or purchaser of goods
or services; esp., the frequent or occasional patron of a business
establishment"). In other words, Defendants and amici argue that some
sort of relationship beyond a one-off sale (such as a sale via the
public markets) must exist between the buyer and seller for the buyer
to be the seller's customer.

we needed any proof that Congress knew how to say 'not any' when it meant 'not any,' here we find it."). For example, Section 11(d) of the Act provides,

> It shall be unlawful for a member of a national securities exchange who is both a dealer and a broker, or for any person who both as a broker and a dealer transacts a business in securities through the medium of a member or otherwise, to effect . . . any transaction with respect to any security (other than an exempted security) unless, *if the transaction is with a customer*, he discloses to such customer in writing at or before the completion of the transaction whether he is acting as a dealer for his own account, as a broker for such customer, or as a broker for some other person.

Original Act § 11(d), 48 Stat. 892 (1934) (codified at 15 U.S.C. § 78k(d)) (emphasis added).

If, as Defendants argue, the Act's definition of "dealer" presupposes a relationship with a customer, Congress had no need to add the phrase "if the transaction is with a customer" in Section 11(d). See <u>State St. Bank & Tr. Co. v. Salovaara</u>, 326 F.3d 130, 139 (2d Cir. 2003) ("It is well-settled that courts should avoid statutory interpretations that render provisions superfluous: 'It is our duty to give effect, if possible, to every clause and word of a statute.'" (quoting <u>Duncan v. Walker</u>, 533 U.S. 167, 174 (2001))).[8] The legislative choice to qualify the

---

[8] The Act's definition of "broker" also did not use the word "customer," but unlike its definition of "dealer," the Act's definition of "broker" made clear that to be a broker, one must have a relationship with a customer or other third party. See Original Act § 3(a)(4), 48 Stat. 883

scope of Section 11(d) by adding the phrase "if the transaction is with a customer" shows with respect to the definition of "dealer" in Section 3(a)(5) that Congress "was perfectly capable of adding language" to "limit a particular provision of the Act" when it wanted to do so. Nero v. Uphold HQ Inc., --- F. Supp. 3d ----, No. 22 Civ. 1602, 2023 WL 5426203, at *5 (S.D.N.Y. Aug. 23, 2023) (quoting Kashanchi v. Tex. Com. Med. Bank, N.A., 703 F.2d 936, 939 (5th Cir. 1983)).

Evidence from the period surrounding the adoption of the Exchange Act in 1934 further supports the SEC's reading of the Act's definition of "dealer." Most notably, commentary by New York lawyer Charles H. Meyer, an authority on securities law cited by amici (see Amicus Br. at 9),[9] noted after the Act was signed into law that "[a] question arises whether a trader who has no customers but merely trades for his own account through a broker is a 'dealer' under the Act":

> A fair interpretation of the Act would seem to indicate that if the operations of a trader are sufficiently extensive to be regarded as a regular

---

(1934) (codified as amended at 15 U.S.C. § 78c(a)(4)) ("The term 'broker' means any person engaged in the business of effecting transactions in securities *for the account of others*, but does not include a bank." (emphasis added)).

[9] Meyer was also cited somewhat often by judicial opinions of his era. See, e.g., Lewis v. MacCrone, 261 N.W. 546, 549 (Mich. 1935); Weisbrod v. Lowitz, 282 Ill. App. 252, 255 (1st Dist. 1935); Hathcock v. Mackubin, 170 A. 573, 576-78 (Md. 1934).

business he would be considered a "dealer." Among those who will be classed as a "dealer," if this interpretation is correct, are professional traders, whether or not they conduct their activities on the floor of an exchange.

Charles H. Meyer, The Securities Exchange Act of 1934 Analyzed and Explained 34 (1934). Seeming to anticipate arguments such as those pressed here by Defendants and amici, Meyer also noted that, to the extent that his reading of the statutory definition may have clashed with what the term "dealer" would have otherwise meant in the securities business at that time, the Exchange Act did not always define terms "in exact accord with the[ir] commonly accepted meaning[s]." Id. at 32. And it is the ordinary public meaning of the language in the Exchange Act's *definition* of "dealer" — i.e., the ordinary public meaning of the phrase "engaged in the business of buying and selling securities" — that controls, regardless of whether the average Wall Street trader of 1934 would have characterized dealers as having customers. Meyer's commentary is evidence that in 1934, the statute meant what a straightforward reading of the broad language "engaged in the business of buying and selling securities" suggests that it means. 15 U.S.C. § 78c(a)(5)(A).

To come to this conclusion is not to hold that Congress defined "dealer" in a way that was totally at odds

with the word's meaning at the time. Although Defendants
and amici show that outside of the context of the Exchange
Act, securities dealers were often characterized as having
customers, they cite no source that goes so far as to
suggest that having customers was a *prerequisite* to being
labeled in common parlance as a dealer. And the SEC's
allegations in this case are otherwise consistent with
contemporaneous descriptions of securities dealers.

For instance, future Supreme Court Justice William O.
Douglas, writing with George E. Bates, described dealers as

> not unlike other dealers in commodities (or services)
> who buy at one price and attempt to find buyers at a
> price sufficiently higher to yield them a net profit
> above expenses; or who find buyers at a given price
> and attempt to buy at a price sufficiently lower to
> yield a similar net profit. Their customers are
> institutions and individuals. Their sources of
> securities are the issuing individuals, institutions,
> corporations, or civil divisions, other dealers,
> dealer combinations (of which they may be members),
> investors, and the open market.

George E. Bates & William O. Douglas, Secondary
Distribution of Securities — Problems Suggested by *Kinney
v. Glenny*, 41 Yale L.J. 949, 951 (1932). This description
comports with the SEC's allegations against Defendants —
that they bought securities "at one price" in the form of
convertible notes or warrants from "issuing individual[]"
penny stock companies, converted the notes or warrants into
stock, and "f[ou]nd buyers at a price sufficiently higher

to yield them a net profit above expenses." Id.; see also
Johnson v. Winslow, 279 N.Y.S. 147, 155 Misc. 170, 178
(N.Y. Cnty. Sup. Ct. 1935) ("Among those who ordinarily act
as stock *dealers* rather than as stock *brokers* are 'over the
counter' houses, which deal in securities not listed on
exchanges." (quoting Charles H. Meyer, The Law of
Stockbrokers and Stock Exchanges (Supp. 1933))).

Likewise, in Coolidge v. Old Colony Trust Co., 156
N.E. 701 (Mass. 1927), the court described a dealer as one
whose "practice was to get as wide a spread as possible
between the bid and asked prices and to conceal from each
customer the price paid or received by the other." 156 N.E.
at 703. In other words, the dealer in Coolidge was
profiting as Defendants here allegedly did: by marking up
the sale prices of securities rather than from any
"appreciation in share price" (Compl. ¶ 48) resulting from
an extrinsic rise in market value of the underlying assets.
Accord Sec. & Exch. Comm'n, Report on the Feasibility and
Advisability of the Complete Segregation of the Functions
of Dealer and Broker at xiv (1936) (stating that a dealer
"receives no brokerage commission but relies for his
compensation upon a favorable difference or spread between
the price at which he buys and the amount for which he
sells"). These sources characterize dealers the same way

Congress did: as people "engaged in the business of buying and selling securities . . . for [their] own account." 15 U.S.C. § 78c(a)(5)(A).

Seeking again to shift the Court's focus from "buying and selling," id., to the presence or absence of customers, Defendants and amici cite Exchange Act-era tax cases (see Def. Mem. at 10; Amicus Br. at 9) construing the term "dealer," but those cases do not help Defendants' cause and actually undermine their position. For example, in Harriman National Bank v. Commissioner, 43 F.2d 950 (2d Cir. 1930), the Court applied a tax regulation whose definition of "dealer" *expressly* provided that dealers have customers. See 43 F.2d at 951 (interpreting regulation providing that a dealer is one "regularly engaged in the purchase of securities *and their resale to customers*" (emphasis added) (quoting Treas. Reg. 45, art. 1585 (promulgated under Revenue Act of 1918))). Similarly, in Donander Co. v. Commissioner, 29 B.T.A. 312 (1933), the Board of Tax Appeals construed a regulation with identical language. See 29 B.T.A. at 314; see also Schafer v. Helvering, 299 U.S. 171, 173–74 & n.1 (1936) (same).

Far from helping Defendants, those cases suggest that the drafters of the applicable tax regulations wanted the term "dealer" to apply only to people selling to customers

but did not think such application would have been self-evident without a definition of the term expressly including the word "customers." Cf. Caraco Pharm. Lab'ys, 566 U.S. at 416; Nero, 2023 WL 5426203, at *5.

Defendants and amici fare no better by pointing to the rule under which courts presume that, "absent other indication, Congress intends to incorporate the well-settled meaning of the common-law terms it uses." Universal Health Servs., Inc. v. United States, 579 U.S. 176, 187 (2016) (quoting Sekhar v. United States, 570 U.S. 729, 732 (2013)). As the phrase "absent other indication" suggests, id. (quoting Sekhar, 570 U.S. at 732), the rule applies only where Congress has not defined the term at issue. See id. (stating that Congress "did not define" the relevant terms); Hall v. Hall 138 S. Ct. 1118, 1128 (2018) (applying this rule where provision contained no definition of relevant term). Thus, assuming for the sake of argument that Defendants would not have been considered "dealers" under the common law at the time of the Exchange Act's passage, this rule of interpretation affords them no protection, given Congress's decision to expressly define the term and to do so broadly.

Defendants next argue that the SEC's complaint is doomed by statements the Commission itself has made over

the years in no-action letters[10] and other guidance
documents. Defendants contend that in these guidance
documents, the SEC offered interpretations of the Exchange
Act that exempt from liability behavior such as the conduct
alleged in the complaint in this action. (See Def. Mem. at
6-16.) But such statements by the SEC, even if accurately
characterized by Defendants, do not bind this Court. See
Amalgamated Clothing & Textile Workers Union v. SEC, 15
F.3d 254, 257 (2d Cir. 1994) (stating that SEC no-action
letters do not bind the district courts or commit the SEC
to a particular course of action); Tang Cap. Partners, LP
v. BRC Inc., --- F. Supp. 3d ----, No. 22 Civ. 3476, 2023
WL 2396635 (S.D.N.Y. Mar. 8, 2023) (stating that SEC
guidance documents do not bind the federal courts).

Moreover, although Defendants suggest (see Def. Mem.
at 9, 12) that this Court must defer to these previous SEC
statements under the doctrine of Chevron, U.S.A., Inc. v.
Natural Resources Defense Council, 467 U.S. 837 (1984),
Defendants provide no indication that Congress, in

_____

[10] SEC no-action letters are issued in response to requests from
individuals who are unsure whether a particular action would violate
the federal securities laws. See U.S. Sec. & Exch. Comm'n, No Action
Letters, Investor.gov, https://www.investor.gov/introduction-
investing/investing-basics/glossary/no-action-letters
[https://perma.cc/M73M-S5DK] (last visited Oct. 26, 2023). If SEC staff
grants the request for no action, the letter concludes that staff would
not recommend that the Commission take enforcement action against the
requester based on the facts and representations described in the
request. Id. SEC staff reserves the right to change the positions
reflected in prior no-action letters. Id.

authorizing the SEC to make such statements, intended them
to "carry the force of law" and thus warrant Chevron
deference. United States v. Mead Corp., 533 U.S. 218, 221
(2001) (holding that tariff classification ruling by U.S.
Customs Service was not entitled to Chevron deference); see
also id. at 229-31 (stating that "the overwhelming number"
of the Supreme Court cases applying Chevron deference "have
reviewed the fruits of notice-and-comment rulemaking or
formal adjudication"). And it is somewhat ironic that
Defendants, attempting to bind the Court to previous SEC
statements supposedly adopting their favored interpretation
of the Exchange Act, invoke Chevron where the opposing
litigant here is the SEC itself, which advocates a
different interpretation of the Act. Cf. Roth ex rel.
Beacon Power Corp. v. Perseus L.L.C., 522 F.3d 242, 247-48
(2d Cir. 2008) (citing Chevron and deferring to
interpretation advanced by SEC in amicus brief filed in
instant litigation, as interpretation was not "plainly
erroneous or inconsistent with the law").

Regardless, the Commission's previous guidance does
not support Defendants' argument here. For example, in
1998, the SEC published guidance regarding what might
constitute dealer activity. See OTC Derivatives Dealers, 63
Fed. Reg. 59362, 59370 n.61 (Nov. 3, 1998). The Commission

said activity that would cause one to be a dealer under the
Exchange Act includes, but is not limited to, "purchasing
*or* selling securities as principal *from* or to customers" or
holding oneself out as being willing "to buy *or* sell one or
more securities on a continuous basis." Id. (emphasis
added).

Here, the SEC's accusations describe this precise type
of activity. For instance, the SEC alleged that Defendants
attended investor conferences to develop industry contacts
who would refer convertible note deals to Morningview, that
Defendants cold-called and cold-emailed issuers regarding
potential investment, and that nearly half the issuers that
Morningview financed through convertible notes sought
additional financing from Morningview, with some selling
the company six or more convertible notes during the
relevant period. (See Compl. ¶¶ 32-37.) Such repeat
activity — i.e., the allegation that nearly half of
Morningview's issuers repeatedly went back to Morningview
as a source of cash — is indicative of a customer
relationship under even a narrow definition of the word
"customer." See Customer, Black's Law Dictionary (11th ed.
2019) (suggesting that the typical customer is "the
frequent or occasional patron of a business
establishment"). And the SEC has alleged that Morningview

repeatedly "purchased . . . securities as principal from" such customers. OTC Derivatives Dealers, 63 Fed. Reg. at 59370 n.61.

Similarly, despite Defendants' reliance on In re Application of Gordon Wesley Sodorff, Jr., Admin. Proc. File No. 3-7390, 52 SEC Docket 1246, 1992 WL 224082 (Sept. 2, 1992), the SEC's statements there do not contradict the position the Commission takes here. In Sodorff, the SEC affirmed a finding that appellant Sodorff unlawfully engaged in the securities business without being registered as a dealer where, "[u]nlike an investor or trader, Sodorff's profits did not result from appreciation in the value of the securities, but rather from his markup over the price he paid." 1992 WL 224082, at *5. Here, the Commission has alleged that Defendants' profits were the result of the same phenomenon, i.e., "the discount applied to the convertible notes that Morningview Financial received on the converted stock, rather than from the appreciation in share price." (Compl. ¶ 48.)

Additionally, the Commission wrote in Sodorff that "[c]ase law has established that the primary indicia in determining that a person has 'engaged in the business' within the meaning of the term 'dealer' is that the level of participation in purchasing and selling securities

involves more than a few isolated transactions." <u>Sodorff</u>,
1992 WL 224082, at *4. And indeed, the SEC has alleged here
that Defendants "sold more than 3 billion newly issued
shares of common stock into the public markets" during the
relevant period; "sold converted shares, on a per-ticker
basis, on 1,044 separate days"; and earned "approximately
$14.8 million in profits from the sale of such shares."
(Compl. ¶¶ 47, 49.)

In short, the SEC has adequately alleged that
Defendants acted as dealers as that term is defined by the
Exchange Act. The Court, in reaching this conclusion, joins
in the reasoning of other federal courts that have been
presented with similar fact patterns. In one case, <u>SEC v.
Keener</u> ("<u>Keener I</u>"), No. 1:20 Civ. 21254, Fed. Sec. L. Rep.
(CCH) ¶ 100,887, 2020 WL 4736205 (S.D. Fla. Aug. 14, 2020),
the Commission accused the defendant of operating as an
unregistered securities dealer by "buying convertible notes
from penny stock issuers, holding the notes for at least
six months, converting the notes into newly issued shares
of stock at a deep discount to the prevailing market price
. . . , and then selling those shares into the public
market for a significant profit." 2020 WL 4736205, at *1.

The defendant in <u>Keener I</u> made the same argument that
Defendants make here — that "he is a 'trader' and not a

'dealer' under the Exchange Act and therefore he does not need to register with the SEC." Id., at *2. The court denied the defendant's motion to dismiss, holding that factors set forth in SEC guidance "do not supplant the [Exchange Act's] plain language" and that in any case, the SEC alleged facts that "come within the ambit of certain of the factors" listed in SEC guidance documents, such as the allegations that the defendant "held himself out to the public as being willing to buy convertible notes at a regular place of business" and that he "hired employees to solicit issuers who were willing to sell convertible notes to him." Id., at *4. Later, the court granted summary judgment to the SEC. See SEC v. Keener ("Keener II"), 580 F. Supp. 3d 1272, 1286–89 (S.D. Fla. 2022) (holding defendant operated as a dealer under the Exchange Act); see also SEC v. Almagarby, 479 F. Supp. 3d 1266, 1272–73 (S.D. Fla. 2020) (holding defendant operated as a dealer where he obtained convertible notes from issuers and converted the notes into discounted shares).

A similar result was reached in SEC v. River North Equity LLC, 415 F. Supp. 3d 853 (N.D. Ill. 2019). In that case, the person who controlled two microcap companies caused the companies to issue him stock and then sold the shares at discounted prices to defendant River North. See

415 F. Supp. 3d at 857. River North's president and sole manager, also a defendant, then quickly resold the stock to investors in unregistered transactions. See id. The SEC accused River North of acting as an unregistered dealer, and defendants moved to dismiss, arguing that River North acted as a trader, not a dealer. See id. at 857–58. The court denied the motion to dismiss, rejecting River North's argument that the SEC "failed to allege the presence of a laundry list of factors set forth in various SEC no-action letters and other guidance" pertaining to the activities of securities dealers. Id. at 858. The court held that the factors, including a factor asking whether the alleged dealer acted as an underwriter, were "not controlling," writing that they "are neither exclusive, nor function as a checklist through which a court must march to resolve a dispositive motion." Id. Further, the court observed that

> like an underwriter, River North (1) purchased stocks at a discounted price directly from numerous issuers . . . (instead of purchasing stocks already in the marketplace, like a trader); and (2) turned a profit not from selling only after market prices increased (like a trader), but rather from quickly reselling at a marked-up price. This arrangement has been recognized by the SEC as characteristic of a "dealer." See [Sodorff, 1992 WL 224082, at *5].

Id. at 859.

Finally, in SEC v. Big Apple Consulting USA, Inc. ("Big Apple I"), No. 6:09 Civ. 1963, 2011 WL 3753581 (M.D.

Fla. 2011), the court granted summary judgment to the SEC on an Exchange Act Section 15(a) claim. See 2011 WL 3753581, at *9–10. The defendants in Big Apple provided investor relations and public relations services to a microcap company in exchange for shares of the company's stock, rather than for cash, and also purchased additional company stock at a discounted rate. See id., at *1–2. The defendants then sold the stock to pay operating expenses. See id., at *2. The court found that the defendants were dealers under the Act, noting that their activity went "well beyond a few isolated transactions." Id., at *10.

On appeal, though the Eleventh Circuit did not reach the district court's holding under the Exchange Act, the Eleventh Circuit expressly endorsed the district court's analysis of the term "dealer" in affirming the district court's separate grant of summary judgment on a claim brought pursuant to the Securities Act of 1933 (the "Securities Act"). See SEC v. Big Apple Consulting USA, Inc. ("Big Apple II"), 783 F.3d 786, 809 n.11 (11th Cir. 2015) (concluding that "[b]ecause the definition of dealers in [the Securities Act] and [the Exchange Act] are very similar, the district court's analysis was sound"). The Eleventh Circuit then set forth the following analysis:

> To qualify as a "dealer," a person must be in the "business of" buying and selling securities. We think the centerpiece to this definition is the word "business," which is defined as "[a] commercial enterprise carried on *for profit*, a particular occupation or employment habitually engaged in for *livelihood* or *gain*[,]" Black's Law Dictionary 239 (10th ed.[ ]2009) (emphasis added). Central to this definition is *profit* or *gain*. . . .
>
> As further evidence of their dealer status, [the defendants] purchased . . . stocks at deep discounts pursuant to [a] contractual agreement with [the issuer] and then sold those stocks for profit.

Id. at 809-10.

Here, the SEC has met the standard set forth by the Eleventh Circuit in Big Apple II, as the complaint alleges that Morningview repeatedly purchased convertible notes, converted them into stock at significant discounts, and sold the stock "for a profit," all pursuant to a "business model" carried out under Riccio's direction and control. (Compl. ¶ 2; see also id. ¶¶ 3-5.)

Defendants' attempt to distinguish these cases is unconvincing. For example, Defendants try to distinguish River North by pointing out that the defendants in that case bought stock, not convertible notes. (See Reply Mem. at 6-7.) Defendants' argument elevates form over substance. Indeed, the SEC alleges that Defendants' entire business model centered on obtaining convertible notes so that the notes could be converted into stock. (See Compl. ¶¶ 2, 38.) The Court does not read River North as a decision that

turned solely on the legal form of the securities that the defendants bought and sold; the <u>River North</u> opinion actually sought to go beyond formalism and determine what the complaint alleged in substance. <u>See River North</u>, 415 F. Supp. 3d at 858 ("[D]espite River North's attempts to persuade the Court otherwise at oral argument, the Court finds that the SEC sufficiently alleged that River North *effectively* extended credit . . . through its take-now, pay-later stance." (emphasis added)). And in any case, Defendants had nothing to say in their reply papers about the <u>Keener</u> or <u>Almagarby</u> cases, which *did* involve defendants who obtained convertible notes and converted the notes into stock. <u>See Keener II</u>, 580 F. Supp. 3d at 1286–89; <u>Almagarby</u>, 479 F. Supp. 3d at 1272–73.[11]

Defendants' argument that the SEC has failed to state a claim under Section 15(a)(1) of the Exchange Act therefore fails. Further, Defendants' contention that the SEC has not adequately alleged control person liability

---

[11] Defendants did briefly mention those cases in their opening memorandum, correctly anticipating that the SEC would rely on them. (<u>See</u> Def. Mem. at 18–20.) To the extent Defendants argue that those cases turned on the presence or absence of minor allegations, such as that a defendant did or did not operate a website or did or did not give a PowerPoint presentation at a conference (<u>see</u> <u>id.</u> at 19), the Court rejects the argument as again elevating form over substance. The SEC has alleged that Riccio and his employee attended investor conferences to develop and maintain industry contacts who would refer them convertible note deals and that they cold-called and cold-emailed issuers regarding possible investment by Morningview. (<u>See</u> Compl. ¶¶ 32–33.)

against Riccio pursuant to Section 20(a) of the Exchange
Act necessarily fails, as well, since that argument depends
on the Section 15(a)(1) claim being dismissed. (See Def.
Mem. at 20.)

B.   DUE PROCESS

The Court turns next to Defendants' argument that
principles of due process bar prosecution of the instant
lawsuit, even if the SEC has stated a claim under the
Exchange Act. Defendants contend that the SEC has
supposedly departed here from the Commission's previous
public statements interpreting the Exchange Act without
fair notice to Defendants. (See id. at 21-23.) This
argument was rejected in the Keener and River North cases.
See Keener I, 2020 WL 4736205, at *5 (stating that the
defendant's due process argument "overlooks the express
language of the Exchange Act"); Keener II, 580 F. Supp. 3d
at 1290-91 (stating that the court was "unconvinced that
[the SEC] changed its interpretation of the Exchange Act's
'dealer' definition to pursue this enforcement action");
River North, 415 F. Supp. 3d at 859 (rejecting due process
argument on the ground that the Exchange Act's definition
of "dealer" is "broad").

36

The Court sees no reason to reach a different result here. Defendants cite Upton v. SEC, 75 F.3d 92 (2d Cir. 1996), where the Second Circuit held that the SEC could not sanction someone "pursuant to a substantial change in its enforcement policy that was not reasonably communicated to the public." 75 F.3d at 98. But nobody in Upton disputed that the relevant entity "complied with the literal terms" of the applicable SEC rule "at all times," and the practice at issue "was standard procedure at several other . . . firms." Id. at 94. And in a later case, the Second Circuit declined to follow Upton where the "plain language" of the relevant regulation gave "fair notice of what it requires." Rock of Ages Corp. v. Secretary of Labor, 170 F.3d 148, 156 (2d Cir. 1999) (quoting Freeman United Coal Mining Co. v. Fed. Mine Safety & Health Rev. Comm'n, 108 F.3d 358, 362 (D.C. Cir. 1997)); see also id. ("[A]n agency's interpretation of a regulation is not undeserving of deference merely because it is advanced by the agency for the first time."). As stated above, the SEC in this case has alleged facts that, if proven, would classify Defendants as dealers under the plain terms of the Exchange Act. Defendants' due process argument thus fails, and the Court accordingly **DENIES** their motion to dismiss.

\*     \*     \*

Synthesizing the above analysis, the Court holds that the plain language of the Exchange Act, the ordinary public meaning of its terms at the time of enactment, previous SEC guidance regarding the Act, and case law from other Circuits interpreting the Act all support a ruling here that to sufficiently allege that a person or entity acted as a prima facie "dealer" under the Act, a litigant must plead facts establishing that the person or entity (1) bought and sold securities, (2) as principal rather than as agent for another, (3) as part of a profit-seeking enterprise, and (4) on more than a few isolated occasions.[12]

## IV.   ORDER

For the foregoing reasons, it is hereby

**ORDERED** that the motion (Dkt. No. 21) filed by defendants Morningview Financial, LLC and Miles M. Riccio (collectively "Defendants") to dismiss the complaint in this action ("Complaint," Dkt. No. 1) is **DENIED**; and it is further

---

[12] Some of the authority cited above suggests that a defendant could rebut such a prima facie showing by establishing that the alleged dealer sought merely to purchase securities in the secondary market and re-sell them following an increase in the prevailing market value of the securities. See Big Apple II, 783 F.3d at 809–10; River North, 415 F. Supp. 3d at 859; Sodorff, 1992 WL 224082, at *5. Defendants, however, concededly bought securities directly from issuers and profited due to discounts they received from issuers rather than from any increase in the securities' market value, so the Court need not rule on the existence or scope of any such affirmative defense.

**ORDERED** that Defendants are directed to file an answer to the Complaint within twenty-one (21) days of the date of this Decision and Order.

**SO ORDERED.**

Dated:   7 November 2023
         New York, New York

_____
             Victor Marrero
                U.S.D.J.